**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**C. E. HARRINGTON,**
**Defendant–Appellant.**

**No. 80–1169.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 13, 1980.

Decided Dec. 22, 1980.

As Amended on Denial of Rehearing and Rehearing En Banc Feb. 13, 1981.

Bernardo P. Velasco, Tucson, Ariz., for defendant–appellant.

Christopher L. Pickrell, Asst. U. S. Atty., Tucson, Ariz., argued for plaintiff–appellee; Gerald S. Frank, Asst. U. S. Atty., Tucson, Ariz., on brief.

Before CHOY and FLETCHER, Circuit Judges, and EAST,* District Judge.

CHOY, Circuit Judge:

Harrington appeals his conviction on five counts of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2). We affirm.

## I. Facts

The area around Douglas, Arizona, is notorious as a smuggling region. On October

---

* The Honorable William G. East, Senior District Judge for the District of Oregon, sitting by designation.

25, 1979 Border Patrol Agent Foley observed Harrington (a California resident) driving aimlessly around Douglas in a blue van that had been rented in Los Angeles. On December 1, 1979 Harrington, once again in Douglas, this time driving a white van with commercial license plates, was stopped by Customs Officer Jennings. The white van also had been rented from a Los Angeles agency. Jennings asked Harrington for his driver's license and to open the back of the van. A check of the license disclosed Harrington's prior drug record. The back of the van contained only a gas can. The tread on the white van's tires matched subsequently–discovered tracks left by a vehicle at a smuggling site. On December 2, 1979 a group of 14 illegal aliens were arrested at that same site. Three of the aliens told the arresting agent that they were supposed to be picked up by a van.

At the request of border patrol agents in Douglas, agents in Los Angeles periodically checked to determine whether Harrington had rented another van. On December 18, 1979, Los Angeles Agent Keating learned that Harrington had rented a white Dodge van that was to be returned on December 21, 1979.

On December 19, 1979 Harrington was seen driving the van in Douglas. When he rented a room at a motel, a border patrol agent rented the one next door. A Mexican male visited Harrington at 7:00 p. m. and 9:00 p. m. that night, and again at 4:15 a. m. the following morning. After the last visit Harrington quickly left the motel, left Douglas by a circuitous route, traveled to a known smuggling spot, and parked with his lights out. The agent watching Harrington saw no one else in the area. Harrington then drove to another alien pick–up site and parked with his parking lights on. Again no one was visible in that area.

Harrington then proceeded to Douglas and was met en route by a second vehicle which appeared to be the same vehicle driven earlier by the male visitor to Harrington's motel room. The two vehicles appeared to be traveling in tandem. Harrington returned to the motel and the other vehicle continued on toward the port of entry at Douglas.

When Harrington left the motel, he drove northwest on Highway 80. An officer observed that the van appeared to ride lower, to sway on turns, to bounce more on dips, and to struggle climbing a hill. At the request of the border patrol a Tombstone police officer stopped Harrington. Harrington got out of his van and met the officer at the rear of the vehicle. While the officer was talking with Harrington about exceeding the speed limit, Border Patrol Agent Escobedo told Harrington that he was an immigration officer and that he was going to check the van. Looking in the side window between the curtain and the door, Agent Escobedo saw a large number of people of Latin extraction inside. Seventeen illegal aliens were found in the van.

Harrington moved to suppress the evidence (*i.e.,* the aliens) seized as a result of an allegedly unlawful stop. At the suppression hearing Harrington testified that no immigration officer spoke to him until after the van had been opened and he had been arrested. Harrington also testified that at the time of the seizure the van was not carrying a maximum load and, therefore, would not have swayed, bounced, or ridden significantly lower. The district court nonetheless denied the motion.

At trial the evidence of the events occurring December 18–20 was presented. Also, five of the aliens testified that they had paid a guide to lead them through the desert and to arrange a trip to Los Angeles. Some testified that a white van or truck was to pick them up and that when Harrington arrived at the pick–up spot, the guide briefly talked with him.

Harrington testified that he was en route to see a female friend in Texas, but stopped in Douglas to try to get some marijuana. He further testified that shortly after leaving Douglas, he stopped to pick up a couple who was hitchhiking. According to Harrington, the male hitchhiker threatened him with a knife and forced him to transport the aliens, telling him that the alien immediately behind him in the van also had a weapon.

On cross-examination the prosecutor asked Harrington whether he told the police officer who stopped his van about the man with the knife. Harrington responded that he had not.[1] Defense counsel moved for a mistrial, but the district court found the questioning to be proper because of Harrington's testimony and, thus, denied the motion.

Harrington contends that the border patrol did not have founded suspicion to stop his van, that the border patrol did not have probable cause to arrest him, and that the cross-examination regarding Harrington's failure to tell the police officer about the alien with the weapon violated his constitutional rights.

## II. Motion to Suppress

■ Where no findings of fact were made or requested, we will uphold a trial court's denial of a motion to suppress if there is a reasonable view of the evidence that will sustain it. *United States v. Williams*, 630 F.2d 1322, 1326–1327 (9th Cir. 1980). We must view the evidence in the light most favorable to the Government. *United States v. Henry*, 615 F.2d 1223, 1230 (9th Cir. 1980).

### A. Founded Suspicion

■ A brief investigatory stop of a vehicle is constitutionally permissible if the officer has founded suspicion, *i.e.*, "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the [vehicle] contain[s] aliens who may be illegally in the country." *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). Some fact or facts must focus suspicion on the particular vehicle as being involved in criminal activity. *See United States v. Carrizoza–Gaxiola*, 523 F.2d 239 (9th Cir. 1975).

■ In determining whether an officer has founded suspicion, we must balance the factors of the particular case, considering such factors as proximity to the border, previous illegal alien traffic, the type of vehicle, the driver's behavior, and the characteristic appearance of aliens. *United States v. Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2581–2582.

Harrington contends that the information obtained as a result of the allegedly unlawful stop on December 1, 1979, should have been suppressed and that with or without that information the officers did not have founded suspicion to stop him on December 20.

### 1. The December 1 Stop

■ Harrington asserts that the evidence of the allegedly unlawful December 1 stop

---

1. The colloquy between Harrington and the prosecutor was as follows:

Q   After the border patrol stopped your van, and it had gotten all these people with those weapons out, did you report that to a law enforcement agency?

A   All what people with what weapons? COUNSEL FOR DEFENSE: Your Honor, I object.
THE COURT: Overruled.

Q   (By the Prosecutor) Well, the knife, and—somebody was sitting in back of you.

A   The guy that had the knife, that I saw, did not get in the van. And—and I assumed the man behind me had a weapon, because that's what he had told me. I have no idea what he did with it.
They took me out of the van, and took me to the Tombstone jail. The next time I saw any of the individuals was when they brought them into the same jail.

Q   No, I'm talking about right—right out there in the highway, after they had gotten you out of the truck, or—the aliens out of—not the truck, but the van—and the aliens out of the van—

A   They didn't take the aliens out of the van on the highway.

Q   They got you out, right?

A   Yes.

Q   Did you tell them at that point that, "Hey, somebody in there may have a weapon; they threatened me"?

A   No, While I was talking to the patrolman, who was—telling me about a citation for speeding, one of the marshals–not marshal, the–well, anyway, he came back with his badge, and told me I was under arrest.

Q   So you never did tell anybody about that?

A   No.

and the evidence obtained thereby should not have been used to support the finding of founded suspicion as to the December 20 stop. Harrington did not make this specific argument to the lower court. Thus, we do not reach this issue. *See United States v. Fong*, 529 F.2d 55, 58 (9th Cir. 1975).

### 2. *The December 20 Stop*

■ Even without considering the evidence obtained from the December 1 stop, we find that there was founded suspicion supporting the stop. Douglas, a town near the Mexican border, is a known smuggling area. Border patrol officers there observed Harrington driving a van, a vehicle commonly used for transporting aliens. Harrington had registered at a motel under an assumed name. During the surveillance of Harrington, border patrol agents observed a Mexican male visiting Harrington's motel room at three different times, for periods of about 15 minutes, the last of which was just before dawn. Almost immediately after this visit, Harrington left his motel room and, after taking a circuitous route, proceeded to two known alien pick-up spots where he parked for a short time. Thereafter the van appeared to be riding lower, swaying on curves, bouncing at dips, and struggling to climb hills. These facts are sufficient to reasonably warrant suspicion that the van contained illegal aliens, and the stop was justified.

### B. *Probable Cause*

■ Probable cause exists where facts within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a reasonably prudent person to believe that an offense has been or is being committed by the person to be arrested. *Dunaway v. New York*, 442 U.S. 200, 208 n.9, 99 S.Ct. 2248, 2254 n.9, 60 L.Ed.2d 824 (1979); *United States v. Chamberlin*, 609 F.2d 1318, 1323 (9th Cir. 1979). Whether an investigative stop becomes an arrest, thereby requiring probable cause, depends on all of the surrounding circumstances including the ex-

tent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop. *United States v. Beck*, 598 F.2d 497, 500–02 (9th Cir. 1979).

Harrington argues that the stop was not a mere investigatory stop, but that in fact he was under arrest as soon as he was told he was going to be questioned about an immigration violation. Because the aliens had not then been discovered, he contends that the warrantless arrest was without probable cause.

■ Harrington was stopped by a police officer, ostensibly for a traffic violation. While they were talking, a border patrol agent identified himself and said to Harrington, "Depending on what I find [when checking the van] I need to come back and talk to you about an immigration violation." There is nothing in these circumstances from which a reasonable person would conclude he was under arrest.

Furthermore, once the border patrol agent saw the aliens through the window of the van, he clearly had probable cause to arrest Harrington and to search the van.

The motion to suppress was properly denied.

### III. *Cross–Examination*

In *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the defendant testified on his own behalf that he had stabbed and killed the victim in self-defense. During cross–examination the prosecutor attempted to impeach the defendant's credibility by asking whether before his arrest he had reported the stabbing to anyone and by suggesting that he would have done so if he had killed in self-defense. The Supreme Court held that the defendant's constitutional rights were not violated where the defendant's own decision to take the stand placed him in a position to be impeached by his prior words or silence and no governmental action[2] induced the defendant to remain silent before his arrest. *Id.* 100 S.Ct. at 2127–30.

2. *E.g.*, being given *Miranda* warnings.

We are presented with similar circumstances in this case. At trial Harrington voluntarily testified on his own behalf that a man with a knife had coerced him into transporting the aliens and had told him that the man sitting behind him in the van also had a weapon. On cross–examination the prosecutor questioned Harrington as to whether, after Harrington was out of the van or after "all these people with those weapons" were out of the van, he told any of the officers "Hey, somebody in there may have a weapon; they threatened me." Harrington admitted that he had not done so.

■ It would seem natural that if Harrington had been threatened with a weapon, he would have blurted that out to the police officer as soon as he was a safe distance away from the van. The prosecutor's questions clearly were probative of Harrington's credibility and, as such, would seem appropriate for use for impeachment purposes.

The problem here is that the prosecutor's questions referred both to when Harrington got out of the van (*before* the arrest), and to when the aliens were removed from the van (*after* the arrest). Thus, under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), in which the Court held that cross–examination regarding the defendant's post–arrest silence violated his constitutional rights, there may have been some infringement in this case.

Even if there was error in allowing the questions regarding Harrington's actions after the aliens were removed from the van, however, it was harmless beyond a reasonable doubt. When Harrington began discussing what happened after he was arrested, the prosecutor focused his discussion on what happened "right out there in the highway, after they had gotten you out of the truck [sic]." The truth of Harrington's testimony was otherwise challenged when, after questioning, he admitted that the hitchhiker who allegedly coerced him into transporting the aliens did not get into the van. Additionally, the aliens testified that they did not see or know of anyone having a knife. Also, the officers testified that Harrington had gotten out of the van voluntarily at least twice–once at the motel just after picking up the aliens and once when stopped just prior to his arrest–suggesting that he was voluntarily driving the van and not being forced by threat of violence.

These facts, combined with the other evidence here, make the Government's case so strong as to preclude doubt about the verdict. *See Bradford v. Stone*, 594 F.2d 1294, 1296–97 (9th Cir. 1979); *United States v. Wycoff*, 545 F.2d 679, 682 (9th Cir.), *cert. denied*, 429 U.S. 1105, 97 S.Ct. 1135, 51 L.Ed.2d 556 (1977). The judgment, therefore, is AFFIRMED.