Eric **WEIR**, Petitioner-Appellee,

v.

Lloyd **FLETCHER**, Superintendent, Bell County Forestry Camp, Respondent-Appellant.

No. 80–3093.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 14, 1980.

Decided Sept. 9, 1981.

Stephen L. Beshear, Atty. Gen., James L. Dickinson, Asst. Atty. Gen., Frankfort, Ky., for respondent-appellant.

Donna Boyce Proctor, Asst. Public Advocate, Frankfort, Ky., for petitioner-appellee.

Before ENGEL and KEITH, Circuit Judges, and LAMBROS, District Judge.*

KEITH, Circuit Judge.

The Commonwealth of Kentucky appeals from the district court's granting of a

* Hon. Thomas D. Lambros, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

writ of habeas corpus. Petitioner Eric Weir took the stand in his own defense at his murder trial in state court. The prosecutor cross-examined him and made comments to the jury concerning Weir's silence after he was arrested but before he was given *Miranda* warnings. The district court concluded that the state had violated Weir's Fifth Amendment Rights, as outlined in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Accordingly, the district court granted Weir's petition for a writ of habeas corpus. We agree, and affirm Judge Johnstone's decision.[1]

## FACTS

Petitioner Eric Weir was convicted in Kentucky state court of first degree manslaughter in the stabbing death of Ronnie Buchanan. The stabbing occurred during a fight in the parking lot of a night club in McCracken County, Kentucky.

1. The state raises a threshold objection. The state argues that Weir's attorney failed to lodge a timely objection to the questions claimed to violate Weir's constitutional rights. The state characterizes this failure as a procedural state default, precluding a federal habeas action under the "cause and prejudice" rule of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

   We disagree. The Kentucky state courts did not invoke their own procedural default rule when they reviewed the case on direct appeal. Since the Kentucky courts did not rely on Kentucky's contemporaneous objection rule, we likewise decline to invoke it at this time. *See Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir.), *cert. denied*, 449 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979).

   In addition we note that while the state raised the issue before the United States Magistrate, it did not include the issue in its objections to the magistrate's report. Under these circumstances, we believe it proper to reach the merits of this appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 2127 n.1, 65 L.Ed.2d 86 (1980).

2. Weir was being held upside down by Buchanan.

3. Well, I was shooting pool with—I didn't know him at the time and I still don't—I think it was Kenneth Turner. I was in the middle of the game when I went out on account of Owen; so, I go back in and get my cigarettes and play a half a pool game or

While the evidence is not clear as to the cause of the fight, all witnesses agreed that during the course of the fight Buchanan pinned Weir to the ground.[2] Suddenly Buchanan jumped to his feet shouting that he had been stabbed. Weir immediately left the scene with his wife, returned momentarily to pick up a friend, and thereafter drove to the home of some friends. He never reported the incident to the police. Subsequently, Weir was apprehended, indicted and brought to trial.

Weir was charged with intentional murder in violation of Kentucky Revised Statute KRS 507.020(1)(a). At trial, he took the stand in his own defense. His testimony on direct examination detailed events inside the bar which led up to the fight and described the circumstances surrounding the stabbing.[3] Weir freely admitted stabbing Buchanan, but claimed that he acted in self-defense and that the stabbing was acci-

something, you know. My wife, I think, was standing there at the door. So, I go on and shoot the rest of this game of pool, or was almost finished with it when my wife says they jumped on Owen. Well, I didn't know what was going on either, you know, so I run out the door and just go down to the end of the building. Well, I said what's going on? I was talking to my wife, and when I did I could see Owen. I couldn't see him until Ronnie Buchanan turned around. He was down further towards the end of that car, and he said I'll tell you what's happening they're all over my car. At that time my wife said well, he's a damn liar. When she said that he just come on running stronger and at the same time swinging at my wife, which she was standing right to my side and in back of me. He swung kind of past me, but I just—all I did was throw up my arm to block that and he come around evidently with his left, because the next thing I knew I was on the ground. I remember him coming down on me and getting ahold of my legs, and he gets me up by the legs and when he picks me up, he's standing on my hair. I think you saw the pictures, it was a little longer than it is now, and he dropped me up and down. He was swinging me all around. I was half conscious about that time after beating my head on the ground a few times, and then he just comes down, I guess, to pin me or whatever; but I remember trying to get the knife out. I was trying to get up from there; I was in bad shape. He come down on me, and

dental. This was the first time he had offered an exculpatory story for his actions.

The prosecutor vigorously cross-examined Weir. He inquired into Weir's assertion that he had been seriously injured. Weir admitted that his injuries had not required medical attention. The prosecutor then turned to the issue of the knife, asking Weir how he happened to stab Buchanan and how the knife happened to disappear after the stabbing.[4] The prosecutor also questioned Weir about his failure to report

then he got up and I heard him say he had been stabbed. Then I got up and I was pretty dizzy. I couldn't really straighten up real good. I remember seeing him backing away, and I just tried to get my stuff together and get out of there.

, I didn't know who was with who, or what. There were several people around that I didn't know—everybody but Owen. I think that she mentioned that I was chasing them up the walk or something, but I had no intention to chase anybody. I was just trying to—my truck was parked on the far end of the building and I was trying to find my wife, and I think I run across her somewhere along about the front door, and I got her and said let's go. We went on down to get in the truck and backed out going towards Paducah.

4. Q Well, you were upside down, as I recall what you said, and you took the knife off the pouch on your right side, you opened it up with both hands and stabbed him, right?

A No, sir. He fell on it. When he come down on me, he come down on the knife.

Q What did you have the knife out for then?

A I was going to try to get him off of me.

Q You did get him off of you; didn't you?

A Yes.

Q Let me ask you about that knife disappearing like it did. Where did you say you put it?

A It was evidently on the tool box on the back of the truck.

Q Why did you put it there? Why didn't you put it back in the pouch?

A Well, I was kind of shook up.

Q Now, you say you took the keys out and unlocked the car; is that right?

A Yes, sir.

Q Why didn't you put your knife back in the pouch, if you didn't?

A I don't know. I just laid it on the truck evidently; it was gone.

Q Do you remember that now, or did somebody say that?

A I distinctly remember laying it up there trying to find the keys.

Q The next day when the State Police came to your house and searched it, why didn't you just tell them that I lost it?

A I don't know.

Q Why didn't you tell the State Police where the knife was?

A I don't guess they even asked me.

Q Well, you didn't offer it, did you?

A No.

Q Then you took off towards Paducah heading home, right?

A I was just leaving.

Q Then you came back and picked up Owen and Debby, right?

A Yes.

Q And after some period, you did end up in Barlow, correct?

A Yes, sir.

Q How long did you stay there?

A Well, we went to Barlow and we stayed all night down there until probably 10:00 o'clock the next morning.

Q Then where did you go? Did you go to Wickliffe after that?

A Yes, sir.

Q What did you do in Wickliffe?

A I stopped by a friend of mines house over there. It wasn't his house, it was his place of business. They had a grocery store and I got some sandwich meat and lunch meat.

Q Who's place is that, Mr. Weir?

A That's Bill Compton.

Q How long were you there?

A Oh, approximately an hour, maybe a little longer—maybe two hours.

Q Did you talk to Bill Compton about what happened?

A No, sir.

\* \* \* \* \* \*

Q What did you tell him you were doing?

A I called him and just asked him if he minded if I came over.

Q What did you tell him you were coming over there for?

A Well, I just asked him if I could stay over at his house, and he said sure.

Q All four of you?

Q Why didn't you tell them at the time that he accidentally fell down on your knife?

A Well, I didn't—

MR. OSBORNE:

Judge, again, I am going to object. He had no reason to tell them anything at the time.

THE COURT: All right.

BY MR. BRYANT:

Q Go ahead and tell us.

A I didn't feel I ought to tell them anything.

Q Okay. That's after your knife disappeared and after you fled all over Ballard County, Barlow, and Wickliffe; and 17 hours later you were picked up. You don't want to

the incident to the police and disclose his exculpatory story.[5] Weir was found guilty of first degree manslaughter and his conviction was affirmed on direct appeal.

Weir then petitioned for a writ of habeas corpus claiming that the prosecutor's effort to impeach his testimony, by inquiring into and commenting upon his failure to offer the exculpatory story to the police officers at the time of his arrest, violated his constitutional rights. Citing *Doyle, supra,* and *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the district court granted the writ conditioned upon the right of the Commonwealth of Kentucky to retry Weir within 120 days. The Commonwealth has appealed.

### I. Preliminary Discussion

We can divide the questions asked by the prosecutor into two basic areas: those concerning pre-arrest silence and flight by the petitioner and those concerning post-arrest silence. Most of the prosecutor's questions dealt with pre-arrest silence. The prosecutor emphasized that the defendant did not go to the police and was not apprehended for 17 hours after the stabbing. The prosecutor also grilled Weir as to what happened to the murder weapon—the knife with which Weir stabbed the victim.[6]

■ Thus far, there was no constitutional impropriety. In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Supreme Court ruled that *pre-arrest* silence could be used to impeach a defendant who takes the stand. Under *Jenkins,* much of the prosecutor's examination of the defendant was proper.

The problem is that the prosecutor did not stop his questioning at petitioner's pre-arrest silence. The prosecutor went on to ask Weir why he had not disclosed the knife's location to the state police when they came to his house to arrest him. The prosecutor also asked Weir why he didn't try to give an exculpatory explanation to the state police when he was arrested.[7]

It does not appear from the record that at the time the state police went to Weir's house and arrested him, that they immediately read *Miranda* warnings to him. Thus, this case presents the threshold question whether post-arrest silence can be used to impeach a defendant, even though *Miranda* warnings were not given to him. For reasons discussed below, we conclude that a defendant cannot be so impeached.[8]

### II. Impeachment on the Basis of Post-Arrest Silence

The underlying rationale for limiting impeachment because of silence is simply that "[i]n most circumstances silence is so ambiguous that it is of little probative force." *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975). In addition,

Q They did go to the Police Department, but you didn't go.
A No.
Q Now, you headed towards Paducah. Why were you going towards Paducah?
A Well, I was going home, I guess. I was just going home.

---

tell us about anything? Of course, you don't have to.
MR. OSBORNE:
Again, I'm going to object to that and move this Court to discharge this Jury in this case because of the conduct on cross-examination.
THE COURT: Overruled.
\* \* \* \* \* \*

5. Q Now, Weir, after this happened, your defense intrigues me, really. It's very interesting to me. After it happened, if this is the way it happened, why didn't you go to the Police Department?
A I didn't know, really, how bad he was hurt, or if he was hurt very bad at all. I didn't really know.
Q All right, so he wasn't hurt very badly, why didn't you go to the Police Department?
A Why didn't anybody else go to the Police Department? Why didn't everybody out there go to the Police Department?

6. The knife was apparently never found. The defendant said he left it in back of his truck, *See* n.4, *supra.*

7. See n.4, *supra.*

8. The Commonwealth argues on appeal that because the record is so unclear, we should remand for an evidentiary hearing as to when *Miranda* warnings were given. Because we conclude that it makes no difference whether warnings were given or not, there is no need to remand.

evidence at the time of arrest ... also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest." *Id.* at 180, 95 S.Ct. 2138 (citation omitted).

*Hale,* of course, was decided under the Supreme Court's supervisory authority over federal proceedings. In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) the Court extended the rationale of *United States v. Hale* to state cases. However, in *Doyle,* the Court was dealing with a constitutional question and its holding was limited:

> We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. *Doyle, supra,* 426 U.S. at 619, 96 S.Ct. at 2245.

A key premise underlying *Doyle* was the unfairness of giving *Miranda* warnings to a defendant—which include a statement that the defendant has the right to remain silent—and then impeaching the defendant at trial with that silence. As the Court noted, "[s]ilence in the wake of [*Miranda*] warnings may be nothing more than the arrestee's exercise of these Miranda rights." *Id.* at 617, 96 S.Ct. at 2244.

In a similar vein, in *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court held that pre-arrest silence was a proper subject for cross-examination of a suspect at trial. The Court concluded that inquiry into pre-arrest silence was not unfair because "no governmental action induced petitioner to remain silent before arrest." *Jenkins, supra,* 100 S.Ct. at 2130.

■ There is thus a superficial logic to the position that only when a government officer actually reads *Miranda* warnings to a defendant is it unfair to impeach the defendant with his post-arrest silence. Nonetheless, we conclude that impeachment of a defendant with post-arrest silence is forbidden by the Constitution, regardless of whether *Miranda* warnings are given. *Doyle* and *Jenkins* were decided on a rationale of basic fairness. We think that it is inherently unfair to allow cross-examination concerning post-arrest silence.

First, we believe that post-arrest silence is not probative. In *Jenkins,* the Supreme Court thought that in many circumstances pre-arrest silence was probative:

> Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. 3A Wigmore, Evidence § 1042, at 1056 (Chadbourne rev. 1970). Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative. *Id.* at 2129.

In the *Jenkins* case itself, the defendant did not come forward with his claim of self-defense until trial. The state courts could conclude that his failure to come forward earlier was a proper ground for cross-examination.

We think that *Jenkins* should be limited to instances of pre-arrest silence. Whatever probative value silence has in a pre-arrest context, it has none in a post-arrest situation. An arrest initiates a formal series of proceedings against a defendant. The defendant stands accused of a crime. Under these circumstances, fear and anxiety will lead a defendant—whether innocent or guilty—to silence. As Justice Marshall stated in *United States v. Hale, supra :*

> At the time of arrest and during custodial interrogation, innocent and guilty alike— perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing

circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. See Traynor, The Devils of Due Process in Criminal Detection, Detention, and Trial, 33 U.Chi.L.Rev. 657, 676 (1966). He may have maintained a silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention.

These considerations have little force in a pre-arrest situation, before one stands accused. Arrest changes things. The fact that one has been arrested is significant and should make a difference.

There is a second important reason not to permit post-arrest silence to be used as impeachment. There is widespread knowledge in society that one who is arrested has no obligation to speak to the police and that he is entitled to consult with an attorney. The news media has widely publicized the *Miranda* case and its formal warnings requirement. Simply stated, many if not most persons under arrest know of their right to remain silent and exercise that right. In fact, many lawyers give out the routine advice to their clients that if the client should be arrested for any reason, the client should say nothing and call the attorney. We do not think that persons who are exercising their right to remain silent should be penalized for it.

*Jenkins* and *Doyle* thought it unfair to impeach by use of silence where "governmental action induced petitioner to remain silent." *Jenkins, supra,* 100 S.Ct. at 2130. We think that an arrest, by itself, is governmental action which implicitly induces a defendant to remain silent. When one combines a suspect's fears and anxieties upon arrest with widespread knowledge of one's right to remain silent, the result is often just that—silence. Given these realities, we think it is fundamentally unfair to allow impeachment through the use of any post-arrest silence.

The facts of this case illustrate this unfairness. Petitioner Weir got into a fight with Ronald Buchanan and stabbed Buchanan to death during the fight. Petitioner fled. After some delay, the police came to his house and arrested him. The police also searched the house. When repeatedly questioned at trial as to why he didn't exculpate himself to the police, petitioner stated that "I didn't feel I ought to tell them anything."

The petitioner was absolutely correct. His best course of action was to consult with counsel and remain silent until then. He generally knew this. It was clear that petitioner would face legal problems as a result of the fight. The nature and extent of these difficulties, however, was unclear. Petitioner's silence was thus not probative of guilt. It was unfairly prejudicial for the prosecutor to pursue this matter at trial.[9]

---

**9.** With the exception of a cryptic dictum in *United States v. Caro,* 637 F.2d 869, 876 (2d Cir. 1981), no post-*Jenkins* court has suggested that the propriety of impeachment by use of post-arrest silence turns on whether *Miranda* warnings were given. In *United States v. Harrington,* 636 F.2d 1182 (9th Cir. 1980), the court found *Doyle v. Ohio* error, albeit harmless, where the prosecutor impeached with post-arrest silence. There was no indication in that case that *Miranda* warnings had been given. *Accord United States v. Curtis,* 644 F.2d 263 (3d Cir. 1981). (*Doyle v. Ohio* error, no evidence *Miranda* warnings were read.) *See also Alo v. Olim,* 639 F.2d 466 (9th Cir. 1980) (*Doyle v. Ohio* error, post-arrest silence; *Miranda* warnings given, but no suggestion in opinion that this was controlling); *Williams v. Zahradnick,* 632 F.2d 353 (4th Cir. 1980) (same).

In addition, a number of pre-*Jenkins* but post-*Doyle* decisions are in accord with our

position. *United States v. Nunez-Rios,* 622 F.2d 1093, 1100–01 (2d Cir. 1980); *United States ex rel. Allen v. Rowe,* 591 F.2d 391 (7th Cir. 1979), *vacated and remanded for reconsideration in light of Jenkins,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *Bradford v. Stone,* 594 F.2d 1294 (9th Cir. 1979); *Douglas v. Cupp,* 578 F.2d 266, 267 (9th Cir. 1978), *cert. denied,* 439 U.S. 1081, 99 S.Ct. 865, 59 L.Ed.2d 52 (1979); *People v. Conyers,* 49 N.Y.2d 174, 424 N.Y.S.2d 402, 400 N.E.2d 342 (1980), *vacated and remanded for reconsideration in light of Jenkins,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). Unlike the dissent, we would accord no significance to a summary order of the Supreme Court vacating and remanding a case for reconsideration in light of an intervening precedent.

We finally note that our holding is in agreement with *Minor v. Black,* 527 F.2d 1, 4 (6th Cir. 1975), *cert. denied,* 427 U.S. 904, 96 S.Ct.

### III. Some Practical Considerations

If we were to limit *Doyle* to instances where the police actually read *Miranda* warnings to a defendant, many practical problems arise.

First, it would penalize the knowledgeable defendant. As indicated above, many persons are aware of their rights and do not need to be read *Miranda* warnings. We see no logic in allowing impeachment of the defendant who tells the police that he is aware of his rights and wants to talk to his attorney, but not allowing impeachment if the police actually read the *Miranda* warnings.

Second, such a position would discourage the reading of *Miranda* warnings. By its terms, *Miranda* applies to "in custody interrogation." *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). This means post-arrest interrogation.[10] Most police departments routinely have officers read *Miranda* warnings at the time of arrest. This helps prevent difficulties which may develop if the officer and the defendant converse on the way to the police station. *See Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). More important, this procedure ensures that the defendant is aware of his rights from the inception of the arrest. However, there is no requirement that the *Miranda* warnings be read at the time of arrest. As the Court noted in *Rhode Island v. Innis, supra*, 446 U.S. at 300, 100 S.Ct. at 1689, "the special procedural safeguards outlined in *Miranda*

are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."[11]

Thus, the police have some discretion in deciding when to read *Miranda* warnings. If we limited *Doyle v. Ohio* to instances where the police actually read the warnings, they could eviscerate *Doyle* through the simple expedient of not reading *Miranda* warnings at the time of arrest. The police could simply arrest a suspect and be careful not to interrogate him for 15–20 minutes. If the police wanted to question the suspect, they could then read the *Miranda* warnings. If the suspect had remained silent for those 15–20 minutes, that silence could be used for impeachment at trial. Such a result would be illogical.

### IV. Harmless Error

The state has a good argument that the improper use of post-arrest silence in this case was harmless beyond a reasonable doubt. The unlawful prosecutorial inquiry into Weir's post-arrest silence was not prolonged or emphasized. In addition, the questions paralleled questions the prosecutor properly asked about Weir's pre-arrest silence. The issue of harmless error in *Doyle v. Ohio* situations has come up often. We refer the reader to *Williams v. Zahradnick*, 632 F.2d 353, 360–65 (4th Cir. 1980) (citing numerous cases) for an extensive discussion of this question.

■ In this case, we conclude that the error was not harmless beyond a reasonable doubt. We are dealing with a fight which

---

3189, 49 L.Ed.2d 1198 (1976) and *United States v. Brinson*, 411 F.2d 1057 (6th Cir. 1969).

**10.** *See Beckweth v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

**11.** The Court thus overstated *Miranda's* requirements in *Doyle v. Ohio*, 426 U.S. at 617, 96 S.Ct. at 2244:

Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a

prophylactic means of safeguarding Fifth Amendment rights, *see Michigan v. Tucker*, 417 U.S. 433, 443–444 [94 S.Ct. 2357, 2363–64, 41 L.Ed.2d 182] (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says might be used against him, and that he has a right to a retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the state is required to advise the person arrested.

ended in a stabbing. As can be expected, the witness' testimony is conflicting. The jury convicted Weir not of murder, but of first degree manslaughter.

Courts should be cautious in applying the harmless error doctrine. *See Eberhardt v. Bordenkircher*, 605 F.2d 275, 278–80 (6th Cir. 1979). In this case, although the error was not pronounced, it may well have affected the jury's decision. The circumstances surrounding the fight and subsequent stabbing were very muddled at trial. A jury plays a particularly important fact-finding role in cases like this. A jury should have an opportunity to determine Weir's culpability without the taint of constitutional error. We conclude that the error was not harmless beyond a reasonable doubt.

### V. Conclusion

The judgment of the district court is affirmed.

LAMBROS, District Judge, concurring.

While I concur completely in the opinion filed by Judge Keith, I wish to emphasize that we do not hold that post-arrest silence is never a proper subject of prosecutorial comment, but only that the propriety of such comment does not depend on whether or not the defendant has been read his *Miranda* warnings. Thus, for example, if a defendant testifies that he told the police an exculpatory version of the facts upon arrest, then the fact of silence may of course be used to challenge the defendant's behavior following arrest. *Doyle v. Ohio*, 426 U.S. 610, 619–20, n.11, 96 S.Ct. 2240, 2245, n.11, 49 L.Ed.2d 91 (1976).

I also wish to elaborate on our finding of prejudicial error. Having held that comments of the sort complained of here are constitutionally impermissible, to find that they are nevertheless harmless would in essence encourage similar misconduct in future cases. I do not feel that we can allow prosecutors the discretion to decide that, having presented ample untainted evidence, they may make this type of comment without jeopardizing the outcome of their case.

ENGEL, Circuit Judge, dissenting.

I respectfully dissent.

In *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), the Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest *and* after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." (Emphasis added). The majority today has misconstrued and misapplied the *Doyle* rationale in affording due process protection to Eric Weir's silence on the facts of this case. I believe the majority's view is so plainly at odds with Supreme Court authority[1] that we are foreclosed from taking such a position.

### I.

The crux of this case can most simply be described as balancing two important elements of our criminal justice system—full factual disclosure in order to ascertain the truth and due process of law. The former is indeed a crucial concern.

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.

*United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). Likewise, prosecutorial crossexamination plays a critical role in the development of facts and the search for truth.[2] Yet, in

---

[1]. *See People v. Conyers*, 49 N.Y.2d 174, 179, 424 N.Y.S.2d 402, 400 N.E.2d 342 (1980), *summarily vacated, New York v. Conyers*, 449 U.S. 809, 101 S.Ct. 56, 66 L.Ed.2d 12 (1980); *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); *Harris v. New York*, 401 U.S. 222, 91

S.Ct. 643, 28 L.Ed.2d 1 (1971); and *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958).

[2]. In *Doyle v. Ohio*, 426 U.S. 610, 617 n.7, 96 S.Ct. 2240, 2244 n.7, 49 L.Ed.2d 91, the Supreme Court stated:

*Doyle* the Supreme Court found that due process barred prosecutorial inquiry into a defendant's silence at the time of his arrest.

The Supreme Court had two grounds for its *Doyle* holding, both intimately related to the fact that the police had given *Miranda* warnings to the defendants at the time of their arrest. The Court first found that once *Miranda* warnings had been given a defendant's silence became "insolubly ambiguous" thereby precluding the jury's use of such silence to discredit an exculpatory story offered at trial. In so ruling, a majority of the Court observed that "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* warnings." *Doyle, supra*, 426 U.S. at 617, 96 S.Ct. at 2244.

Second, the Court stated that it would be "fundamentally unfair" to use a defendant's silence to impeach an explanation offered at trial, after being impliedly assured by express *Miranda* warnings that silence would carry no penalty. *Id.*, at 618, 96 S.Ct. at 2245. Implicit in this rationale is an apparent apprehension that *Miranda* warnings could be employed, either deliberately or innocently, to induce silence which is later used to impeach the defendant at trial. Thus, express *Miranda* warnings block future inquiry into silence in order to protect an individual from the fundamental unfairness of contrived impeachment evidence.

## II.

This case does not involve the type of "fundamental unfairness" found in *Doyle*, where explicit *Miranda* warnings induced the defendant to remain silent and promised his silence would be respected.[3] There is no evidence that *Miranda* warnings were ever given to Eric Weir. Weir's arrest, without evidence of some other improper police tactics, was not in itself fundamentally unfair; the police were under no obligation to give *Miranda* warnings until they began the process of interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). *See also People v. Conyers*, 49 N.Y.2d 174, 424 N.Y.S.2d 402, 400 N.E.2d 342, 350 (1980) (Meyer, J., dissenting), *summarily vacated*, 449 U.S. 809, 101 S.Ct. 56, 66 L.Ed.2d 12 (1980). Nor, once Weir had taken the stand, was it unfair for the prosecutor to cross-examine him as to his activities after the stabbing.

> If [a defendant] takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness . . . . "[H]e has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts."

*Brown v. United States*, 356 U.S. 148, 154–55, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958) (*quoting Fitzpatrick v. United States*, 178 U.S. 304, 315, 20 S.Ct. 944, 948, 44 L.Ed. 1078 (1900)). *See also Doyle, supra*, 426

We recognize, of course, that unless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge.
*See also*, 426 U.S. at 628–30 and n.8, 96 S.Ct. at 2249–50 and n.8 (Stevens, J., dissenting). In *Jenkins, supra*, 100 S.Ct. at 2129 (1980), quoting *Brown v. United States*, 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958), the Supreme Court stated:
> Once a defendant decides to testify "[t]he interests of the other party and regard for the function of the courts of justice to ascertain the truth become relevant, and prevail in the balance of the considerations determining the

scope and limits of the privilege against self-incrimination."

**3.** In *Jenkins, supra*, 100 S.Ct. at 2130, Justice Powell, who also authored *Doyle*, stated:
> Only in *Doyle* . . . did we find that impeachment by silence violated the Constitution. In that case a defendant received the warnings required by *Miranda* . . . . In this case, no governmental action induced petitioner to remain silent before the petitioner was taken into custody *and* given *Miranda* warnings. (Emphasis added).

And in *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 2181, 65 L.Ed.2d 222 (1980), the Supreme Court stated, "In *Doyle*, we held that the Due Process Clause prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings."

U.S. at 625–26, 96 S.Ct. at 2248 (Stevens, J., dissenting).

The majority broadly asserts that because of "widespread knowledge in society" about the Fifth Amendment privilege, "many if not most persons under arrest know of their right to remain silent and exercise that right." *Ante* at p. 1131. As much might as easily be said of silence before arrest, or at any other time, for that matter. This is of course inconsistent with the underlying premise of *Miranda* that most citizens do not know their constitutional rights and must be informed of them.[4] It directly contradicts the observation in *Jenkins* that "[I]n the absence of an express assertion of the privilege [against self-incrimination], the presumption is that the privilege was not exercised." *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 2133 n.9, 65 L.Ed.2d 86 (1980) (Stevens, J., concurring). In *Roberts v. United States*, 445 U.S. 552, 559–60, 100 S.Ct. 1358, 1364–65, 63 L.Ed.2d 622 (1980), the Supreme Court stated with telling clarity:

> The Fifth Amendment privilege against compelled self-incrimination is not self-executing . . . . *Miranda's requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed* . . . . (Emphasis added).

In my view, the majority's approach here is precisely what persuaded the Supreme Court to vacate *Conyers, supra*. It invites innumerable occasions where the truth-seeking function of the criminal trial process will be impeded, without protecting an individual's constitutional rights. The price for such speculative gains is simply too great. In the words of Justice Frankfurter, it makes "of the Fifth Amendment not only a human safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell." *Brown, supra*, 356 U.S. at 156, 78 S.Ct. at 627. The majority points to the fact of arrest as "governmental action which implicitly induces a defendant to re-

main silent." *Ante* at p. 1131. The fact of arrest alone, however, is no substitute for evidence of reliance on a constitutional right which is necessary to rebut the presumption, applicable in this case, "that the privilege was not exercised." *Jenkins, supra*, 100 S.Ct. at 2133 n.9.

The majority seemingly concludes that post-arrest silence has no probative value, but as Judge Lambros observes in his concurring opinion, even *Doyle* recognizes that in certain circumstances, post-arrest silence can be used to impeach a defendant. *See Doyle, supra*, 426 U.S. at 619–20 n.11, 96 S.Ct. at 2245 n.11. Further, Justice Stevens acknowledged that "under accepted rules of evidence, . . . [a defendant's] silence . . . [can be] tantamount to a prior inconsistent statement and admissible for purposes of impeachment." *Id.*, at 622, 96 S.Ct. at 2246. In *Charles v. Anderson*, 610 F.2d 417, 420 (6th Cir. 1979), *rev'd per curiam*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), this court recognized that post-arrest silence may sometimes be probative:

> We begin with the proposition that *Doyle* does not prohibit every impeachment use of a defendant's post-arrest silence, but only those which are fundamentally unfair.

Nor does the majority's conclusion square with the precedent upon which it purports to rely, *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). In *Hale*, the defendant was arrested for robbery, taken to the police station, and given his *Miranda* warnings. However, he refused to make a statement. The defendant took the stand at his trial and offered an alibi defense. The prosecutor cross-examined the defendant regarding his post-arrest silence. In ruling on the propriety of the prosecutor's inquiry as a matter of federal evidentiary law, the Supreme Court recognized:

> Silence gains more probative weight where it persists in the face of accusation,

---

4. "[W]e will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given." *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966). Arguably, the eventual conclusion to be drawn from the majority's rationale is that *Miranda's* therapeutic rule is no longer needed.

since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation. Failure to contest an assertion, however, is considered evidence of acquiescence only if it would have been natural under the circumstances to object to the assertion.

*Id.*, at 176, 95 S.Ct. at 2136. The Court had previously noted, "If the Government fails to establish a threshold inconsistency between silence at the police station and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded." *Id.* The Court refused to find an inconsistency in *Hale* because:

[T]he situation of an arrestee is very different, for he is under no duty to speak and, as in this case, *has ordinarily been advised by government authorities only moments earlier that he has the right to remain silent . . . .*

*Id.* (emphasis added). Unlike the situation in *Hale*, Weir was not advised of this right.

It is indeed difficult to discern why as a practical matter, the precise moment of arrest must automatically make any silence lose all probity of the truth of a defendant's exculpatory story. While *Doyle* holds that the administration of *Miranda* rights makes the accused's subsequent silence "insolubly ambiguous," it has always seemed to me at least that the more persuasive reason is that while the silence may still be probative, its value is diminished and at that point is outweighed by the need to protect the integrity of the promise made by the administration of the warnings.

The majority asserts that failure to extend *Doyle* will penalize those defendants who already know their constitutional rights, even without *Miranda* warnings.

*Ante* at p. 1132. I do not view the rule as a penalty; it simply fails to provide a shield because there is no adequate reason for it. If the defendant elects to testify, he may still explain that his silence was premised on the exercise of the right. That is not a shocking confession of guilt; indeed many jurors may well be in complete sympathy with such conduct and find it utterly logical. It is basically no different from any other fact concerning which he may testify. I see no harm in letting the jury weigh that circumstance with all the others.

The same logic also dispels the notion that the police may deliberately withhold *Miranda* warnings so as to preserve the opportunity to use silence for impeachment purposes. Perhaps so, but if they do, it may be at the risk of a good opportunity to get a valid confession, and their well laid plans, assuming they are astute enough to formulate them, will be frustrated if the accused never takes the stand. Most state courts have the same power to prohibit such inquiry as is vested in federal courts by Rule 403 of the Federal Rules of Evidence;[5] if not, the defendant always has the therapeutic safeguard of explaining his silence on the stand. In any case, the Supreme Court has noted:

The impeachment process . . . undoubtedly provide[s] valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby.

*Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971).

The majority's approach here is strikingly similar to the rationale articulated by the majority in *Conyers, supra*. I subscribe generally to the view expressed by Judge

---

**5.** Such relief in federal prosecutions is specifically afforded by Federal Rule of Evidence 403:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Particular circumstances may require, as a matter of fundamental fairness and hence of due process that evidence of a defendant's post-arrest silence be excluded. It is necessary for our purposes here, however, only to observe that the fact of arrest itself does not trigger the fundamental fairness bar.

Meyer in his dissent in that case. The *per se* rule articulated today by the majority was rejected by the Supreme Court when it summarily vacated the state court's decision in *Conyers*. It has been rejected primarily because it places an unjustified and unnecessary burden upon the truth-seeking process.

Even if I were to agree with the majority's view, I would conceive myself obliged to reverse, noting my obedience to the prevailing Supreme Court authority while expressing my disagreement with it. I see nothing wrong with such an approach. This is how the law moves. This in my view would have been a far more appropriate response than that made by the majority today.