THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEROME GIVENS, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON J. BEARD, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL GIVENS, Defendant-Appellant.

Fourth District    Nos. 4—84—0371, 4—84—0401, 4—84—0402 cons.

Opinion filed August 15, 1985.

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellants.

John X. Breslin and John M. Wood, both of State's Attorneys Appellate Service Commission, of Ottawa, for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

The defendants, Jerome Givens, Carl Givens, and Aaron Beard, were charged with aggravated battery causing great bodily harm, attempted murder, and armed violence. A jury acquitted them of the armed violence and attempted murder charges, but found them guilty of aggravated battery. The trial court sentenced Carl to seven years' imprisonment, Beard to five years' imprisonment, and Jerome to 30 months' probation. The court also ordered Jerome and Beard to pay restitution to the victim. The defendants appeal their convictions and sentences, contending: (1) A fatal variance between the pleadings and proof requires reversal; (2) the jury's verdicts were legally inconsistent; (3) the trial court erred in admitting a handgun into evidence; (4) the admission of testimony concerning Beard's post-arrest silence violated both Federal and State constitutional provisions; (5) the trial court erred in excluding evidence of the victim's drug usage; and (6) their sentences were unjustifiably disparate from each other with respect to incarceration, probation, and restitution.

At trial, Gary Bolden testified he knew all three defendants. On November 7, 1983, he was drinking at Jimmy Harold's tavern. When the bar closed, he went to an alley behind the bar and saw the three defendants drive up in a car. He talked with them for 15 to 20 minutes, and then the four of them left in the car. The defendants were drinking wine from a bottle. Bolden did not drink anything after leaving the bar. He did not believe he was intoxicated. Bolden wanted a ride home, but the defendants wanted to go to another bar.

During the ride, Carl asked Bolden to give him a .357 magnum that he thought Bolden had. The gun belonged to William Morris, a friend of Carl's, and had been taken from Morris during an altercation involving Bolden. Bolden denied having the gun. Carl stated that he had his gun with him. Carl got out of the car and invited Bolden to fight. Bolden waited for Carl to come back into the car, then Boden got out. He headed for his house, but when he got in front of it, the car pulled up across the street. Carl got out and grabbed Bolden. Bolden struck him and Carl fell down, but he got up again and grabbed Bolden. Bolden hit him again and knocked him down. Beard and Jerome got out of the car. Beard grabbed Bolden from behind, and Jerome blocked the path to Bolden's house. Jerome kicked Bolden once and Beard hit him in the face twice. Bolden then felt a blow to his right eye. He though Carl had landed a "lucky punch." The three defendants then left. Bolden went to a neighbor's house and was taken to the hospital.

Bolden admitted he had used cocaine and heroin since 1979. He

testified his drug usage varied between every other week and once a month. He denied being under the influence of drugs on November 7. He testified he had last used either cocaine or heroin a couple of days before the incident. He admitted he had told hospital personnel that he had not taken any narcotics for a week prior to the incident.

Gail Pearl observed the scuffle as she drove by it. She saw Jerome standing in the area. She also heard a noise, which she described as a "pop."

Dr. Michael Meinzein treated Bolden at the hospital. He described Bolden as uncommunicative and combative. Bolden told a nurse that he had been beaten up. X rays revealed the presence of a foreign object near the right eye socket. Meinzein believed the object entered Bolden in the area above the eyebrow. Meinzein could not say whether the object was metallic. Bolden's blood alcohol level was .14%. Tests also revealed the presence of both marijuana and cocaine in Bolden's urine, but the test could not reveal when those substances had been ingested.

Danville police officer Brent Young talked to Bolden at the hospital. Bolden initially told Young that he had not been shot. He also told Young that Jerome had just stood back and laughed during the fight. The next day, other Danville police officers went to Jerome's residence. No one answered the door when they knocked, but the officers heard movement inside. After about one hour, Jerome and Beard came to the door and were arrested. A search of the car driven by the defendants revealed an empty wine bottle. Inside the house, police found a white jacket soaking in a bathtub. The jacket had red stains on it. Police also found a .22-caliber pistol underneath a crockpot on the back porch. Officers Frank Christian and Keith Garrett attempted to unload the gun. They discovered the firing pin was jammed, and it took much effort to get the gun apart. The cylinder in the handgun spun freely, and Garrett did not believe the firing pin had been made for that gun. The gun contained two spent rounds and three live ones.

Christian and Garrett also interviewed Beard and Jerome that afternoon. Garrett told Beard that he was going to read him his *Miranda* rights. Beard, however, stated that he did not want to talk to the officers, and that he knew nothing about anybody named Gary Bolden allegedly being shot. Givens, after being read his *Miranda* rights, stated he did not know anything about the incident because he had been home all night. Jerome also told the officers that he had been in the basement when the officers arrived, and he had gone outside after seeing the officers. On December 1, 1983, Carl was arrested in Kansas City. He gave the name of Floyd Jones to police officers

when arrested.

The handgun was introduced into evidence over the defendants' objections. Edward German, a forensic scientist and fingerprint specialist, testified that none of the prints taken from the gun were the defendants'. He described the gun as very shiny, like a mirror.

Rory Steidl, a Danville police officer, testified that he spoke with Gary Bolden on November 15, 1983. Bolden told him that he and another man had disarmed William Morris. Bolden also stated Jerome Givens had been present during the fight, but that he could not remember if Jerome had kicked him. While on the way to the hospital on November 7, Bolden had told Steidl that Jerome had kicked him. William Morris testified that during an earlier altercation, Bolden had taken a .357 magnum from him. Priscilla Givens testified that on November 7 Carl's nose and lip were bleeding. Priscilla, Audrey Beard Clay and Garrett all testified that Bolden did not have a good reputation for truthfulness and honesty and for peacefulness and law-abiding conduct.

All three defendants gave similar versions of the incident. The defendants testified they had known Bolden for a long time. That evening, they had gotten together and gone to Jimmy Harold's tavern at about 10 p.m. They did not see Bolden at the tavern. They first saw him as Bolden was walking down Williams Street toward his house at about 11 p.m. The defendants were parked in a lot across from Bolden's house. Bolden got into the car with the three men and for about half an hour the four men talked, listened to music, and drank. All three defendants described Bolden as being either drunk or high. Bolden asked Carl and then the other two if they wanted to purchase a gun from him for money or a combination of cocaine and money. The defendants told Bolden they were not interested in the gun, which Bolden told them he had taken from William Morris. Bolden angrily left the car and started walking toward his house. As the defendants began to drive away, Bolden flagged them down. Carl got out of the car to see what Bolden wanted. Carl testified Bolden asked him for money, and then hit him and kicked him when he refused. Beard and Jerome noticed Carl was doubled over. They then observed Bolden hit Carl, throw him to the ground, choke him, and pound his head on the sidewalk several times. Bolden said that he would kill Carl.

As Beard attempted to pull Bolden off Carl, Bolden struck him. Jerome stood off to the side and watched because he was on crutches due to having earlier lost his kneecap. Carl then rose and struck Bolden with his fist in retaliation. Neither Beard nor Jerome struck

Bolden. Bolden was standing when the three men left and did not appear to be severely injured. All three defendants denied having a gun.

After the altercation, all three defendants went to Jerome's house. Carl stayed for a short while and then cleaned up and left. While Carl did not recall bleeding, Beard and Jerome testified that he had been. The next morning, Beard and Jerome were in the basement fixing the furnace. They went outside when they saw the police. Beard testified they did not go to the police in the first place because they were certain they would not be believed. Both Beard and Jerome believe that Bolden's reputation for truthfulness and honesty and for peacefulness and law-abiding conduct was not good. Jerome admitted to having a 1974 robbery conviction and a 1979 burglary conviction. Jerome also stated that he had not told Garrett that he had been home all night. Rather, he had stated that he knew nothing about the incident and that Beard had stayed all night at his house. Carl testified he did not report the incident and went to Kansas City after learning that Jerome and Beard had been arrested. He believed he would be unjustly charged and imprisoned for the incident. He used the name Floyd Jones when arrested because of his fear and his status as a parolee.

### I. VARIANCE BETWEEN THE PLEADINGS AND PROOF

The defendants contend a variance between the pleadings and proof requires reversal of their convictions. The information filed against defendants charges them with aggravated battery by knowingly causing great bodily harm to Bolden in that they shot him in the head. The defendants maintain the State failed to prove a shooting occurred. They note Bolden neither saw nor heard a gun and thought Carl had gotten in a lucky punch. Bolden, however, testified he "didn't realize I was shot." He also testified Carl had said he had a gun with him. The defendants also note Dr. Meinzein could not identify the objection in Bolden's eye as metallic. Meinzein did testify that a foreign object entered Bolden in the area above the eye. The defendants further argue the jury's acquittal on the attempted murder and armed violence charges demonstrates that they believed no shooting occurred. The jury's findings on those charges could simply have been an expression of lenity. (*People v. Barnard* (1984), 104 Ill. 2d 218, 470 N.E.2d 1005.) Contrary to the defendants' assertion, there was evidence of a shooting, and we need not decide whether the State proved a shooting beyond a reasonable doubt.

The defendants assert the allegation of a shooting was essential to the information. Essential allegations must be proved without vari-

ance. (*People v. Mosby* (1962), 25 Ill. 2d 400, 185 N.E.2d 152.) In *Mosby*, the State failed to present proof of ownership of premises which the defendant allegedly burglarized. At that time, an allegation of ownership was indispensable in charging burglary. (*People v. Rothermel* (1982), 88 Ill. 2d 541, 545, 431 N.E.2d 378, 380.) The defendants also cite *People v. Bueno* (1966), 35 Ill. 2d 545, 221 N.E.2d 270, in which the supreme court reversed the defendant's conviction. He had been charged with delivery of narcotics to a police officer, but the proof at trial established only that he had sold narcotics to a codefendant. The court decided the issue was not one of variance but whether the State had proved the charge set forth in the indictment. *Bueno* involved two separate offenses, one with which the defendant had been charged, and a second which the evidence indicated the defendant had actually committed. *People v. Ritter* (1980), 89 Ill. App. 3d 113, 115, 411 N.E.2d 560, 562; *People v. Kijowski* (1978), 61 Ill. App. 3d 809, 812, 377 N.E.2d 1324, 1326.

The defendants rely primarily on *People v. Daniels* (1979), 75 Ill. App. 3d 35, 393 N.E.2d 667. In *Daniels*, a grand jury charged the defendant with armed robbery based on his taking money from the victim. On appeal, the court noted the State had not presented evidence that the defendant took money, and the only proof had concerned the taking of a watch. The court found the State had failed in its burden of proof by utterly failing to introduce proof to conform to the charge in the indictment. The court went on to reject the State's contention that the defendant had forcibly taken the watch. The court concluded the circumstantial evidence did not prove robbery beyond a reasonable doubt. *Daniels*, therefore, is a case where the State had failed to present sufficient proof of an essential allegation, the taking of property.

■ We have previously stated the presence or use of a weapon is not an element of aggravated battery causing great bodily harm. (*People v. Decker* (1984), 126 Ill. App. 3d 428, 467 N.E.2d 366.) Immaterial matters or matters which may be omitted from an indictment without rendering it insufficient or doing damage to the material averments may be regarded as mere surplusage. When an indictment or information charges all of the essential elements of the offense, other matters unnecessarily added may be rejected as surplusage. (*People v. Figgers* (1962), 23 Ill. 2d 516, 519, 179 N.E.2d 626, 627.) The State is not required to plead evidentiary details. (*People v. Drink* (1967), 85 Ill. App. 2d 202, 229 N.E.2d 409.) The allegation that the defendant shot Bolden was not essential to the charge of aggravated battery causing great bodily harm.

■ The defendants argue the information misled them. Even if an allegation is not essential, reversal is required if the defendant was misled in preparing his defense or could be exposed to double jeopardy. (*People v. Rothermel* (1982), 88 Ill. 2d 541, 431 N.E.2d 378.) As the information contained the essence of aggravated battery, it is difficult to see how the defendants were misled. They contend they may have chosen not to testify if they had known they could be convicted for merely beating Bolden. Prior to trial, however, Beard and Jerome revealed their intention to assert self-defense, and all three defendants testified at trial that they had acted in self-defense. The defendants' previous claim that Bolden was struck only in self-defense is incongruous with their present claim that they did not know they could be convicted for beating, rather than shooting, Bolden. (88 Ill. 2d 541, 547-48, 431 N.E.2d 378, 381.) Finally, the defendants raised no double jeopardy issue.

## II. INCONSISTENCY OF THE VERDICTS

■ The defendants argue that convictions on the aggravated battery charges are legally inconsistent with the acquittals on the armed violence charges. They note the armed violence charges were based on the alleged commission of aggravated battery while armed. In *People v. Frias* (1983), 99 Ill. 2d 193, 457 N.E.2d 1233, the court stated that while logically inconsistent verdicts can stand, legally inconsistent ones cannot. In *Frias*, the jury found the defendant not guilty of murder but guilty of armed violence based on having committed murder while armed. The statute, however, required the defendant to have committed the predicate felony before he could be convicted of armed violence. Based on the doctrine of collateral estoppel, the court concluded the finding that defendant had not committed murder precluded a finding that he had committed armed violence based on the same murder charge.

Unlike *Frias*, this case does not present any collateral estoppel problem. Rather, this case is similar to *People v. Barnard* (1984), 104 Ill. 2d 218, 470 N.E.2d 1005. In *Barnard*, the jury found the defendant guilty of murder but not guilty of armed violence based on murder. The court declared the verdicts, while logically inconsistent, were not legally inconsistent. The court decided the acquittal on the armed violence charge could simply have been an expression of lenity. Furthermore, the verdicts in the present case were not necessarily even inconsistent. As previously discussed, the aggravated battery charge did not require proof of possession or use of a weapon.

### III. ADMISSION OF THE HANDGUN

■ The defendants contend the trial court erred in admitting the handgun into evidence. The issue is one of relevance. Generally, physical evidence may be admitted provided there is proof to connect it with the defendant and with the crime. The distinction between the admissibility of evidence and its probative value must not be confused. It is only necessary that the object at least be suitable for the commission of the offense, but it is not necessary that the object actually be used in committing the offense. (*People v. Free* (1983), 94 Ill. 2d 378, 415-16, 447 N.E.2d 218, 236.) Proof of the connection between the object and the defendant or the crime may be circumstantial. The determination of whether evidence is admissible with regard to its relevancy is left to the discretion of the trial court. *People v. Miller* (1981), 98 Ill. App. 3d 453, 458, 424 N.E.2d 624, 628.

The defendants argue the proof failed to show the gun was suitable for the offense. They again contend there was no evidence of a shooting. As previously indicated, this assertion is incorrect. They also maintain the lack of their fingerprints on the gun and Bolden's failure to notice it although it was shiny in appearance make it unlikely that the gun was the one used. These matters merely go to the probative weight of the evidence. The defendants contend the evidence indicated the gun was inoperative. They point to the testimony of police officers concerning their difficulty in unloading the gun. The cylinder turned freely, and one officer speculated that the firing pin in the gun had not been made for that gun. The officers, however, never testified the gun could not be fired. The gun contained three live shells and two spent ones, suggesting that it had, in fact, been fired. The defendants complain because the State did not present evidence to show that the gun was physically similar to the one used. As long as the weapon possessed by the defendant when arrested is suitable for the offense charged, it is admissible without the necessity of connecting it to the crime in any other manner such as similarity in appearance. *People v. Starr* (1976), 37 Ill. App. 3d 495, 346 N.E.2d 410.

■ When there is evidence that the accused possessed a weapon at the time of the offense, a similar weapon connected to the defendant by its presence in the area at the time of arrest may be admitted into evidence even though not identified as the weapon used. (*People v. De La Fuente* (1981), 92 Ill. App. 3d 525, 414 N.E.2d 1355.) Bolden testified Carl had stated he had a gun with him. In all likelihood, it would have been a handgun. The nature of the wound and the fact that Pearl heard a "pop" suggests the use of a small caliber weapon. We find no abuse of discretion.

### IV. TESTIMONY CONCERNING BEARD'S POST-ARREST SILENCE

When Beard was arrested, police officers attempted to question him. At trial, Officer Christian testified that when they tried to read Beard his rights, Beard stated he "didn't want to hear it." He stated he "didn't have anything to say" and that "he didn't know anything about the shooting" of Bolden. Officer Garrett testified Beard had indicated he did not prefer to talk and stated, "He didn't know anything about anybody named Gary Bolden getting shot." During the cross-examination of Beard, the following exchange occurred:

"Q. And you talked—excuse me. You saw Keith Garrett at the Public Safety building right?

A. Yes.

Q. And did you tell him any of this that you're saying today?

A. Tell him any of what?

Q. About what you say happened on Williams Street?

A. No.

Q. Why not?

A. Because I didn't want to tell him."

The defendants contend this testimony concerning Beard's post-arrest silence violated the due process clause and the privilege against self-incrimination of both the State and Federal constitutions. They maintain the error requires all the convictions be reversed.

In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the Supreme Court held the use of a defendant's post-arrest silence to impeach an exculpatory story told for the first time at trial is a deprivation of due process under the fourteenth amendment. The court noted silence in the wake of *Miranda* warnings may be nothing more than the exercise of the defendant's rights. The court concluded such silence is "insolubly ambiguous" because of what the State is required to advise the defendant. Although the *Miranda* warnings do not carry an express assurance that silence will carry no penalty, the court decided such an assurance is implicit to anyone who receives the warnings. The court held it would be fundamentally unfair to allow silence after receipt of the warnings to be used to impeach an explanation offered at trial. 426 U.S. 610, 617-18, 49 L. Ed. 2d 91, 97-98, 96 S. Ct. 2240, 2244-45.

The State argues *Doyle* is inapplicable because Beard did not remain totally silent following his arrest. The State interprets Beard's statement to police as a denial of knowledge of any altercation involving Bolden. Relying on *Anderson v. Charles* (1980), 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180, the State maintains it could question

Beard about the inconsistency between his voluntary statement to police and his trial testimony. Neither *Doyle* nor *Anderson*, however, requires a defendant to maintain absolute silence after his arrest. The fact that Beard failed to remain totally silent did not render *Doyle* inapplicable. (*Phelps v. Duckworth* (7th Cir. 1985), 757 F.2d 811, 818.) The cross-examination was designed to lead the jury to conclude Beard's testimony was not credible because he had not related his story to the police at the time of his arrest.

The State also asserts *Doyle* is inapplicable because Beard had not received the *Miranda* warnings. In *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857, our supreme court extended the rule in *Doyle* to apply even when there was no evidence that the defendant had been previously given the *Miranda* warnings. The court noted the *Miranda* warnings do not confer rights upon a defendant but merely advise him of those rights. Because an arrested person has the right to remain silent and may be aware of that right even in the absence of *Miranda* warnings, the court concluded post-arrest silence remains "insolubly ambiguous." Finally, the court noted the failure to apply *Doyle* would reward police for failing to give the required warnings. 74 Ill. 2d 514, 521-22, 386 N.E.2d 857, 860.

Subsequent to *Beller*, the United States Supreme Court decided *Jenkins v. Anderson* (1980), 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124. *Jenkins* involved the use of pre-arrest silence to impeach the defendant's testimony that the killing was in self-defense. The court decided no fifth amendment violation occurs when a defendant who testifies in his own defense is impeached with his prior silence.

> "[I]nquiry into prior silence was proper because '[t]he immunity from giving testimony is one which the defendant may waive by offering himself as a witness *** When he takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined ***' " (447 U.S. 231, 235, 65 L. Ed. 2d 86, 92-93, 100 S. Ct. 2124, 2128.)

The court noted it had previously rejected the notion that requiring an accused who chooses to testify, to testify fully impairs to an appreciable extent the policies behind the right to remain silent. (See also *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643.) Finally, the court reasoned that permitting such impeachment advances the truth-finding function of the criminal trial:

> "Attempted impeachment on cross-examination of a defendant, the practice at issue here, may enhance the reliability of the criminal process. Use of such impeachment on cross-examina-

tion allows prosecutors to test the credibility of witnesses by asking them to explain prior inconsistent statements and acts. A defendant may decide not to take the witness stand because of the risk of cross-examination. But this is a choice of litigation tactics. Once a defendant decides to testify, '[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.' " (447 U.S. 231, 238, 65 L. Ed. 2d 86, 94, 100 S. Ct. 2124, 2129.)

We believe *Jenkins* is dispositive of any claim of the defendants under the fifth amendment.

The court in *Jenkins* also found no due process violation in permitting a defendant's pre-arrest silence to be used to impeach his trial testimony. The court decided the fundamental unfairness present in *Doyle* was absent in *Jenkins* because no governmental action had induced the accused to remain silent. This finding undermined, at least in part, the rationale employed in *Beller*. The fifth amendment protection applies at all times, not just after arrest. It privileges an individual not to answer official questions in any formal or informal proceeding, where the answers might incriminate him. (*Lefkowitz v. Turley* (1973), 414 U.S. 70, 38 L. Ed. 2d 274, 94 S. Ct. 316.) Prior to an arrest, an individual may be aware of his rights and simply rely on them. The Supreme Court, however, decided it would not be a deprivation of due process unless the government induced the silence.

After *Jenkins*, the Court of Appeals for the Sixth Circuit held an arrest itself was sufficient governmental action which implicitly induced the defendant to remain silent. (*Weir v. Fletcher* (6th Cir. 1981), 658 F.2d 1126.) The court in *Weir* found practical considerations favored application of *Doyle* even in the absence of *Miranda* warnings. The court noted the widespread knowledge of the *Miranda* warnings and the effect of penalizing knowledgeable defendants and discouraging the reading of the *Miranda* warnings if *Doyle* was not applied. The Supreme Court rejected the Sixth Circuit's analysis in *Fletcher v. Weir* (1982), 455 U.S. 603, 71 L. Ed. 2d 490, 102 S. Ct. 1309. The court explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him. The court held that absent the sort of affirmative assurances embodied in the *Miranda* warnings, a State does not violate the due process clause by allowing cross-examination as to post-arrest silence when the defendant chooses to testify. In effect, the court held the sixth circuit's practical considerations were

not of constitutional magnitude.

■ The defendants contend *Fletcher* should apply only when a defendant is actually unaware of his rights. They contend Beard's statement that he did not want to hear his rights demonstrates that he knew those rights and was merely exercising them. *Fletcher* and *Jenkins*, however, emphasized the unfairness of the use of silence after governmental assurances that silence would carry no penalty. (See also *Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182.) "In sum, the receipt of *Miranda* warnings is determinative of the constitutional issue." (*United States v. Massey* (10th Cir. 1982), 687 F.2d 1348, 1353.) *Fletcher*, therefore, is dispositive of the defendants' due process argument under the fourteenth amendment.

The defendants urge us to construe the Illinois Constitution of 1970 as more restrictive than the Supreme Court interpretation of the Federal Constitution. (See *Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215.) The defendants contend the use of Beard's post-arrest silence violated sections 2 and 10 of article I of the Illinois Constitution. In *People v. Miller* (1983), 96 Ill. 2d 385, 450 N.E.2d 322, our supreme court noted the contradiction between *Beller* and *Fletcher* but found it unnecessary to resolve the differing principles.

The defendants point to decisions from other jurisdictions which have rejected *Fletcher* in interpreting their State constitutions. Courts in California, Pennsylvania, and Alaska have held the use of post-arrest silence to impeach a defendant's trial testimony violates the privilege of self-incrimination under their respective State constitutions. (*People v. Jacobs* (1984), 158 Cal. App. 3d 740, 204 Cal. Rptr. 849; *Commonwealth v. Turner* (1982), 499 Pa. 579, 454 A.2d 537; *Nelson v. State* (Alas. App. 1984), 691 P.2d 1056.) In *Jacobs*, the California Appellate Court relied on decisions of its supreme court construing the privilege against self-incrimination as broader under the State constitution than under the fifth amendment. (158 Cal. App. 3d 740, 746, 204 Cal. Rptr. 849, 854.) Although not mentioned in *Turner* or *Nelson*, we note the Pennsylvania and Alaska Supreme Courts had done likewise. (*Commonwealth v. Triplett* (1975), 462 Pa. 244, 341 A.2d 62; *Scott v. State* (Alas. 1974), 519 P.2d 774.) In *Lee v. State* (Fla. App. 1982), 422 So. 2d 928, the court refused to follow *Fletcher* in interpreting the State due process clause. The *Lee* court noted its supreme court viewed the right to remain silent as entitled to greater protection under Florida law than under Federal law. (422 So. 2d 928, 930.) At least one jurisdiction has refused to depart from *Fletcher* in

construing its constitution. *State v. Hunt* (N.C. App. 1984), 323 S.E.2d 490.

The defendants rely primarily on *State v. Davis* (1984), 38 Wash. App. 600, 686 P.2d 1143, in which the court refused to follow *Fletcher* under the Washington due process clause. The court stated Federal decisions, while given great weight, were not controlling in construing the State due process clause. The court found no logic in protecting a defendant advised of his rights but not protecting an unadvised one. An unadvised defendant, however, has not been induced by governmental action to remain silent; rather, he has freely chosen to exercise his right. If he later decides to waive that right and testify, he should be subjected to cross-examination as any other witness. On the other hand, due process considerations should prevent the State from impliedly promising a defendant that his silence will not be used against him and then reneging on that promise.

Unlike the majority of jurisdictions which have rejected *Fletcher*, Illinois has consistently followed the Supreme Court of the United States in situations concerning the application of a more restrictive view of an individual's constitutional rights than previously enjoyed. (*People v. Cannon* (1974), 18 Ill. App. 3d 781, 784, 310 N.E.2d 673, 676.) Our supreme court has stated it "will follow the decisions of the United States Supreme Court on identical State and Federal constitutional problems." (*People v. Jackson* (1961), 22 Ill. 2d 382, 387, 176 N.E.2d 803, 805.) In fact, the court has overruled its previous decisions in order to conform to decisions of the United States Supreme Court. See *People v. Sturgis* (1974), 58 Ill. 2d 211, 317 N.E.2d 545, overruling *People v. Luna* (1967), 37 Ill. 2d 299, 226 N.E.2d 586; and *People v. Jones* (1967), 38 Ill. 2d 427, 231 N.E.2d 580, overruling *People v. Lewis* (1966), 34 Ill. 2d 211, 215 N.E.2d 283.

■ The Federal amendments were the prototypes for our own constitutional provisions, and we perceive no reason why they should be interpreted differently. (*People v. Reynolds* (1932), 350 Ill. 11, 182 N.E. 754.) Section 10 of the Illinois Constitution and the fifth amendment "differ in semantics rather than in substance and have received the same general construction." (*People ex rel. Hanrahan v. Power* (1973), 54 Ill. 2d 154, 160, 295 N.E.2d 472, 475.) They are the same in effect. (*People v. Grod* (1944), 385 Ill. 584, 53 N.E.2d 591.) Our due process clause is worded almost identically to the Federal provision. Like the fourteenth amendment, our due process clause applies only to State action. (*Sargent v. Illinois Institute of Technology* (1979), 78 Ill. App. 3d 117, 397 N.E.2d 443.) The defendants have not identified any differences in the language or historical purpose between section

2 and the fourteenth amendment which would warrant a departure from *Fletcher*. We, therefore, hold the use of Beard's post-arrest silence as impeachment of his trial testimony did not violate either the Illinois or Federal Constitutions.

## V. EXCLUSION OF EVIDENCE CONCERNING BOLDEN'S DRUG USAGE

■ The defendants contend the trial court erred in refusing to allow Priscilla Givens to testify about her observations of Bolden's previous drug usage.. They also complain because Investigator Garrett was not permitted to testify that the alley behind Jimmy Harold's tavern was a "shooting gallery," a place where illegal substances were injected. The defendants contend this testimony was relevant to Bolden's use of drugs. The question of whether a witness is a narcotics user is an important consideration in passing upon his credibility for the testimony of a narcotics addict is subject to suspicion due to the fact that habitual users become notorious liars. *People v. Strother* (1972), 53 Ill. 2d 95, 99, 290 N.E.2d 201, 204.

■ Bolden was extensively cross-examined concerning his drug usage. He admitted using drugs since 1979 and admitted taking cocaine a few days before the incident. Neither Priscilla's nor Garrett's testimony would have contradicted or added to Bolden's testimony. The defendants fully presented Bolden's previous drug usage, and the jury could assess the evidence in determining his credibility. *People v. Ganci* (1978), 57 Ill. App. 3d 234, 372 N.E.2d 1077.

## VI. DISPARITY OF SENTENCES

■ The trial court sentenced Beard and Carl to five and seven years' imprisonment respectively, but sentenced Jerome to 30 months' probation. Carl and Beard argue their sentences are grossly disparate from Jerome's. They contend Jerome's previous record and potential for rehabilitation were as bad or worse then theirs. The trial court agreed but decided Jerome's level of participation in the offense did not justify imprisonment. A disparity in sentences will not be disturbed on review where warranted by differences in the nature and extent of the concerned defendant's participation in the offense. (*People v. Godinez* (1982), 91 Ill. 2d 47, 55, 434 N.E.2d 1121, 1125-26.) The evidence supports the court's decision. Carl was the instigator and direct cause of the loss of sight in Bolden's right eye. Beard struck Bolden twice in the face and held him for Carl. Bolden testified Jerome had kicked him once, but he had also told police officers that Jerome had not hit him. Jerome's previous injury severely limited his ability to participate in the scuffle.

■■■ The defendants next contend that the trial court erred in ordering Beard and Jerome to pay restitution, but not Carl. The rationale offered for this argument is that the defendants who are similarly situated may not receive grossly disparate sentences. (*People v. Henne* (1973), 10 Ill. App. 3d 179, 293 N.E.2d 172.) Beard and Jerome maintain that they were less culpable than Carl and had previous records no worse than his.

The restitution provision in effect when the defendants were sentenced (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—6) did not preclude the trial court from ordering restitution as to some, but not all, codefendants. The statute is permissive rather than mandatory. The defendants have referred to the language of this section as it has been amended (see Ill. Ann. Stat., ch. 38, par. 1005—5—6, at 65-67 (Smith-Hurd Supp. 1985)), but that language is not applicable to this case and we offer no comment upon the operation of the provision as amended.

The trial court in sentencing a defendant does not operate in a vacuum in considering sentencing options such as incarceration, fine, and restitution. There is but one sentence with components as to each defendant. If the comparative sentencing dispositions of codefendants are not otherwise an abuse of discretion, the fact that a restitution order is entered as to some, but not all, codefendants does not itself require that the restitution orders be vacated. In the present case, the record justifies the sentences imposed. We find the defendants' sentences, considering all the components which make up those sentences, are not unduly disparate as to amount to an abuse of discretion. We, however, find that remand is necessary to determine the amount and conditions of payment. *People v. Pearson* (1982), 108 Ill. App. 3d 241, 439 N.E.2d 31.

For these reasons, the defendants' convictions are affirmed. The defendants' sentences are also affirmed, except that portion of Jerome Givens' and Aaron Beard's dealing with restitution, which is vacated and remanded for a hearing on the amount and manner of payment.

Affirmed in part, vacated in part and remanded.

GREEN, P.J., and MORTHLAND, J., concur.