NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190251-U

NO. 4-19-0251

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 17, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| WILLIAM LOCKHART, | ) | No. 18CF301 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    (1) When all of the evidence is viewed in the light most favorable to the prosecution and when all reasonable inferences are resolved in the prosecution's favor, a rational jury could find, beyond a reasonable doubt, the elements of aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2018)) and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)).

(2) A box cutter, admitted in the jury trial, was not clearly irrelevant, and, thus, its admission was not a plain error.

(3) Grouping together the four constitutional principles in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) into one continuous recitation of law before asking the prospective jurors if they understood and accepted the principles was not a clear violation of that rule and, hence, was not a plain error.

(4) Procedurally forfeited issues are forfeited, regardless of whether they are regarded individually or cumulatively.

(5) As long as there are multiple physical acts, the interrelationship of the acts does not prevent multiple convictions.

¶ 2     In the Livingston County circuit court, a jury found defendant, William Lockhart, guilty of aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2018)) and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). For those offenses, the court sentenced him to two years' imprisonment. Lockhart appeals on five grounds.

¶ 3     First, Lockhart claims that the evidence was insufficient to support his convictions of aggravated battery and unlawful possession of a weapon by a felon. Looking at all of the evidence in the light most favorable to the prosecution and resolving all reasonable inferences in the prosecution's favor, we conclude that a rational trier of fact could find, beyond a reasonable doubt, the elements of those two offenses.

¶ 4     Second, although, soon after the battery, the police seized a box cutter that was clipped to Lockhart's belt, Lockhart maintains that there was no evidence connecting the box cutter to his alleged crimes and that admitting the box cutter in the trial was, therefore, a mistake. This argument is procedurally forfeited. Also, because the box cutter was not clearly irrelevant, the doctrine of plain error does not avert the forfeiture.

¶ 5     Third, Lockhart complains that, in its admonitions to the prospective jurors, the circuit court lumped together the four constitutional principles in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) into one continuous, unwieldy statement of law before asking the prospective jurors if they understood and accepted the principles. This issue is procedurally forfeited. Also, because the admonitions did not clearly violate Rule 431(b), the doctrine of plain error does not avert the forfeiture.

¶ 6     Fourth, Lockhart argues that the Rule 431(b) admonitions and the admission of the box cutter had the cumulative effect of making his trial unfair. We are unconvinced. Besides,

forfeited issues are forfeited issues, regardless of whether they are regarded individually or cumulatively.

¶ 7          Fifth, Lockhart maintains that convicting him of both aggravated battery and unlawful possession of a weapon by a felon violated the one act, one crime rule because, according to him, those two offenses were based on the identical physical act. No, they were not. There was a physical act essential to aggravated battery that was inessential to unlawful possession of a weapon by a felon: cutting Clarence with the box cutter.

¶ 8          Therefore, we affirm the judgment.

¶ 9                              I. BACKGROUND

¶ 10                              A. *Voir Dire*

¶ 11          There was only one venire. The circuit court told the 17 potential jurors:

> "Since this is a criminal trial, there are certain propositions of law that you must be willing to follow. I am going to recite those for you now and ask that you listen carefully as I will be asking if you understand these principles of law and if you accept these principles of law."

The court then recited, all at once, the four constitutional principles listed in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). These principles, the observance of which is essential to a fair trial, are called "the *Zehr* principles," after *People v. Zehr*, 103 Ill. 2d 472 (1984). An example of a *Zehr* principle is that defendants are presumed innocent. See Ill. S. Ct. R. 431(b)(1) (eff. July 1, 2012).

¶ 12          After reciting the *Zehr* principles, all four of them at once, the circuit court asked the potential jurors:

> "So by a show of hands, do each of you understand these principles of law? If so, please raise your hand.

And do each of you accept these principles of law? If so, raise your hands again.

Okay. Thank you."

¶ 13                                   B. The Jury Trial (February 7, 2019)

¶ 14                                          1. *The Fight*

¶ 15        Late at night on October 6, 2018, in Pontiac, Illinois, John Dronenberg had some friends over to his apartment for a party. There was drinking. Dronenberg got into an altercation with Lockhart and punched him in the face, knocking him unconscious. As Lockhart was lying on the floor, out cold, Dronenberg directed one of his guests, Rebecca Cox, to remove Lockhart from the premises. Rebecca, who was acquainted with Lockhart, tried to roll him toward the doorway. She succeeded, however, only in waking him, and when he came to, he delivered a punch to her jaw, knocking her dental implants loose.

¶ 16        Rebecca, who was drunk, did not call the police. Instead, she stepped over Lockhart, left the apartment, and walked home. She awakened her husband, Clarence Cox, who had left off partying earlier, around 8 p.m., to come home and sleep off his own overindulgence of liquor. By 3 a.m., when Rebecca awakened him, Clarence had pretty much sobered up. After hearing from Rebecca what had happened at Dronenberg's, Clarence rose from his bed and walked to Lockhart's residence, a block away, to confront him.

¶ 17        Standing chest to chest with Lockhart, Clarence demanded to know why Lockhart had punched his wife. One of them—Lockhart or Clarence, it is unclear which—ventured a shove, and then they began tussling. For about 10 minutes, Clarence and Lockhart traded blows. Eventually, the fight moved into the middle of the street: a normal street in Pontiac, with sticks

- 4 -

and rocks. They went down to the pavement. Clarence pounded Lockhart's head on the street a couple of times. Then they regained their footing and resumed punching one another.

¶ 18    Since it was around 3 a.m., it was dark in the middle of the street where they were fighting, but it was not completely dark: there was a streetlight at the end of the block, and some porch lights were on. Defense counsel asked Clarence:

> "Q. So you were not operating in total darkness?
>
> A. No.
>
> Q. You were able to find Mr. Lockhart without any problems?
>
> A. Yeah.
>
> Q. You were able to see him to fight him?
>
> A. Yeah. Until we were out in the middle of the street.
>
> Q. You never saw a weapon?
>
> A. No."

Clarence never felt himself being stabbed either.

¶ 19    But then an unnamed onlooker screamed, bringing the fight to a standstill and prompting Clarence to look down and notice that he was bleeding. Clarence started walking home. The prosecutor asked him:

> "Q. Did you see it on your body where the blood was coming from?
>
> A. Coming down from my neck and my right biceps.
>
> Q. Describe the right biceps.
>
> A. It was right in the middle of my biceps. It was bruised already. And there was a little puncture wound.
>
> Q. And that was the location where the blood was coming from?

A. Yes."

¶ 20                                    2. *The Photographs*

¶ 21          Clarence went to the hospital, where photographs of his injuries were taken as he lay on the hospital bed. (He did not need any stitches—only a butterfly bandage.)

¶ 22          People's exhibit Nos. 1B and 1C show a thin, superficial scratch extending in approximately a straight line from the vicinity of Clarence's breastbone diagonally downward to his right side. It looks as if it were inflicted by a needle point dragged across the skin. There is another, similar scratch beneath it, though fainter and shorter.

¶ 23          People's exhibit No. 1B also shows a blue bruise on the right bicep. Within the bruise is a comma-shaped puncture wound approximately the size of a dime. It appears that a red bar of skin irritation leads down to the puncture wound. People's exhibit No. 1D is a closer shot of this puncture wound on the right bicep.

¶ 24          Also, in People's exhibit No. 1B, two more puncture wounds can be seen on the upper left chest, just under the collarbone. People's exhibit No. 1F is a closer shot of the same. These two puncture wounds, which are close together, are very short linear incisions: one about the diameter of a nickel and the other about the diameter of a dime. Blood has clotted in them, and a faint red line of skin irritation leads to one of the puncture wounds. A much fainter, barely visible area of skin irritation leads to the other puncture wound.

¶ 25          People's exhibit No. 1E shows a bruise over Clarence's right eyelid. Above this bruise, on the ridge of the right ocular orbit, about where the eyebrow ends, is what appears to be a body piercing without any jewelry in it. A pinpoint drop of blood, clotted, has oozed from the body piercing. At the same corresponding position on the left ocular orbit, a curved silver wire of jewelry has been inserted.

¶ 26        People's exhibit Nos. 2A and 2B show red spatters of what appears to be blood on the street where Clarence and Lockhart fought. Otherwise, it looks like a typical blacktop street, strewn with small gravel and a couple of fallen leaves.

¶ 27                        3. *The Box Cutter*

¶ 28        John Marion, a Pontiac police officer, testified that during the night shift on October 6, 2018, he was called out on a report of a possible battery. He arrived at Locust and Michigan Streets, where he spoke with Ariana Callum, Bernard Benson, and Lockhart. Benson and Callum had no idea why Marion was there. Then Marion spoke with Lockhart, who was on a bicycle.

¶ 29        Lockhart, who appeared to be intoxicated, had swelling on the left side of his face, blood on his clothing, and a box cutter clipped to his belt. Because Marion had been "dispatched to the area for a stabbing," he removed the box cutter from Lockhart's belt. No blood was visible on the box cutter (People's exhibit No. 4). Nor was the box cutter ever "sent to be checked."

¶ 30        People's exhibit Nos. 3A, 3B, and 3C are photographs of Lockhart's bloodstained clothing: a white short-sleeved pullover T-shirt and blue jeans. The prosecutor asked Marion:

> "Q. Did you ask him about the blood on his clothes?
>
> A. Yes.
>
> Q. What did he say?
>
> A. He had told me he had been jumped.
>
> Q. Did he want to elaborate on that at all?
>
> A. No.
>
> Q. Ultimately, did he change his story?
>
> A. Yes.
>
> Q. And what did he change it to?

A. He had stated he had fallen off his bike."

¶ 31                         4. *Lockhart in the Emergency Room*

¶ 32         Marion transported Lockhart to the emergency room. Lockhart, handcuffed to the hospital bed, was yelling and was "uncooperative." Marion was unable to photograph the swelling and the bruising to the left side of Lockhart's head. Every time Marion tried to take a picture, Lockhart turned his head, "push[ing] his face into the pillow."

¶ 33                         II. ANALYSIS

¶ 34          A. The Sufficiency of the Evidence to Prove Aggravated Battery

¶ 35         The jury found Lockhart guilty of aggravated battery within the meaning of section 12-3.05(f)(1) of the Criminal Code of 2012 (720 ILCS 5/12-3.05(f)(1) (West 2018)). The relevant language of that section provides that a person commits aggravated battery if, in committing a battery, he or she uses a deadly weapon other than by discharging a firearm. *Id.* (An aggravated battery by the discharge of a firearm is covered by another subsection of section 12-3.05. See *id.* § 12-3.05(e).) Thus, to prove Lockhart guilty of aggravated battery as charged in the information, the State had to prove, beyond a reasonable doubt, two propositions: (1) Lockhart battered Clarence and (2) Lockhart used a deadly weapon in his battery of Clarence. See *id.* 12-3.05(f)(1); *People v. Turner*, 77 Ill. App. 3d 985, 987 (1979).

¶ 36         On appeal, Lockhart does not argue that the evidence was insufficient to prove his battery of Clarence. See 720 ILCS 5/12-3 (West 2018) (providing that "[a] person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual"). Nor does Lockhart argue that the evidence was insufficient to prove that the box cutter was a

deadly weapon. Lockhart does argue, however, that the evidence was insufficient to prove his use of the box cutter in the battery.

¶ 37    There was no *direct* evidence that Lockhart used the box cutter to batter Clarence. No one, not even Clarence, testified that they saw Lockhart do so. Thus, the State had to prove by *circumstantial* evidence that Lockhart used the box cutter in the battery. "Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer other connected facts that human experience dictates usually and reasonably follow." *People v. Day*, 2019 IL App (4th) 160217-B, ¶ 47. The State had to prove facts from which a commonsense conclusion could be derived that Lockhart had cut Clarence with the box cutter. See *id.*

¶ 38    Regardless of whether the evidence in the trial was direct or circumstantial, our review of the evidence is deferential toward the jury. See *People v. Digirolamo*, 179 Ill. 2d 24, 43 (1997). "[I]t is not the function of this court to retry the defendant." *Id.* Rather, as Lockhart acknowledges, "the standard of review is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

¶ 39    For four reasons, Lockhart contends that it would be impossible for a rational trier of fact to infer, from the proven facts and circumstances, that he, Lockhart, used the box cutter on Clarence.

¶ 40    First, in Lockhart's opinion, the very resort to inferential analysis is desperate and unreasonable. He argues that it would have been impossible for him to stab Clarence over and over again without anyone's seeing him do so. He maintains that, in the illumination of the streetlight and the porch lights, Clarence, standing toe to toe with Lockhart, surely would have noticed the box cutter if Lockhart had swiped it across Clarence's midriff and had stabbed Clarence in the arm

and the chest with it. How could someone get stabbed in the front over and over again without noticing it?

¶ 41        Viewing the evidence, however, in the light most favorable to the prosecution (see *id.*), we are unconvinced that Clarence *necessarily* would have seen a box cutter in Lockhart's hand. After all, they fought outside at 3 a.m. Granted, there was a streetlight, but it was at the end of the block. And granted, some porch lights were on, but porch lights typically are not bright enough to dispel the darkness as far out as the middle of the street. Clarence testified, in so many words, that it got darker as he and Lockhart moved into the street. Defense counsel asked Clarence: "Were you able to see [Lockhart] to fight him?" Clarence answered: "Yeah. Until we were out in the middle of the street." It is far from obvious that, at night, in the dim light in the middle of the street, Clarence would have seen the small exposed end of the razor blade. The rest of the box cutter, the handle or the case, could have been out of sight in Lockhart's fist. Because the record appears to lack a photograph of the box cutter, we will construe the omission against Lockhart by assuming that this was a simple, no-frills box cutter with a small triangle of razor blade that was exposed when, by a push of the thumb, the blade was protracted from the case. See *People v. Stroud*, 2020 IL App (3d) 190064, ¶ 7. This would not have been like a dagger with a long, gleaming blade. The blade would not have been conspicuous. In the dark, in the flurry of the fight, already aching from the punches, Clarence might have thought that Lockhart was still flailing at him with his fist. Clarence did not perceive immediately that he had been cut.

¶ 42        Second, Lockhart observes, the State never called an expert to opine that the box cutter could have caused Clarence's wounds, which Lockhart describes as "minor scrapes and bruises." In the photographs, they do not look like scrapes. A scrape is an injury caused by abrasion, like road burn or the friction of knuckles on a cheekbone. The injuries shown in the

photographs are, by contrast, narrow punctures and a long, thin scratch: wounds that would be inflicted by a pointed blade. The ordinary layperson knows what a pointed, sharp-edged blade does to the skin. Most people have accidentally punctured or scratched themselves with a sharp point or have sliced themselves with a sharp edge. These types of wounds and the kind of instrument that inflicts them are within common experience. It is commonly known that gravel and sticks on a city street do not typically cause these thin, neat little incisions. In this regard, no expert was required. See *People v. Byrd*, 206 Ill. App. 3d 996, 1004 (1991).

¶ 43 Third, Lockhart notes, the State never presented the jury with Clarence's clothing—or even a photograph of his clothing—to show any telltale cuts. A reasonable trier of fact, however, could have regarded the clothing as inessential, given the cuts on Clarence's skin.

¶ 44 Fourth, Lockhart points out that no blood was seen on the box cutter and that the box cutter was never subjected to DNA testing although the State had a sample of Clarence's DNA. Fair enough: such forensic evidence would have strengthened the State's case, which, as the circuit court remarked, was far from overwhelming. Even so, when we consider the photographs of Clarence's wounds, we are unable to say that all reasonable triers of fact would have regarded such laboratory evidence as indispensable.

¶ 45 In sum, it is reasonably inferable that the box cutter that Marion took off Lockhart's person shortly after the fight was on Lockhart's person during the fight. It also is reasonably inferable that the box cutter inflicted the puncture wounds and lacerations photographed on Clarence's torso and right arm. That Lockhart lied to Marion, an investigating police officer, could suggest Lockhart's awareness that he had something more serious to hide than an ordinary tussle. See *People v. Williams*, 176 Ill. App. 3d 73, 77 (1988). When we look at all of the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond

a reasonable doubt, the elements of aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2018)). See *Digirolamo*, 179 Ill. 2d at 43.

¶ 46                     B. The Sufficiency of the Evidence to Prove

Unlawful Possession of a Weapon by a Felon

¶ 47          Lockhart advances a "corollary" to his argument that the evidence was insufficient to prove his *use* of the box cutter in his battery of Clarence: the evidence was insufficient to prove that Lockhart *possessed* the box cutter with *the intent to use it unlawfully* against Clarence. To prove Lockhart guilty of unlawful possession of a weapon (720 ILCS 5/24-1.1(a) (West 2018)), the State had to prove that he "[c]arrie[d] or possess[ed]" the "razor" "with [the] intent to use the same against another unlawfully" (*id.* § 24-1(a)(2)).

¶ 48          As we have discussed, however, the evidence was sufficient to prove Lockhart guilty of aggravated battery with the box cutter (see 720 ILCS 5/12-3.05(f)(1) (West 2018)). Therefore, the evidence was sufficient to prove him guilty of possessing the box cutter with the intent to use it unlawfully (see 720 ILCS 5/24-1.1(a), 24-1(a)(2) (West 2018)). To use the box cutter unlawfully against Clarence, Lockhart would have had to possess it with the intent to do so—at least in the moment of the aggravated battery.

¶ 49          C. The Relevance of the Box Cutter as Evidence

¶ 50          Lockhart contends that "there was no foundation demonstrating the box cutter was connected to the fight" and that the admission of the box cutter, therefore, was erroneous. He acknowledges that, in the jury trial, he never objected to the admission of the box cutter, let alone reiterated the objection in his posttrial motion. He admits that, normally, both measures—a contemporaneous objection and its repetition in a written posttrial motion—are necessary to preserve an issue for review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). He argues, however,

that, because the evidence in the trial was closely balanced, we should set aside the procedural forfeiture and take up this issue. See *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 51 Typically, the first step in plain-error analysis is determining whether there was a clear or obvious error. *People v. Clayton*, 2019 IL App (3d) 170315, ¶ 23. Since the issue here is one of relevance (see *People v. Givens*, 135 Ill. App. 3d 810, 819 (1985)), we ask whether the box cutter, People's exhibit No. 4, was clearly or obviously irrelevant (see *Clayton*, 2019 IL App (3d) 170315, ¶ 23).

¶ 52 "When there is evidence that the accused possessed a weapon at the time of the offense, a similar weapon connected to the defendant by its presence in the area at the time of arrest may be admitted into evidence even though not identified as the weapon used." *Givens*, 135 Ill. App. 3d at 819. Arguably, the puncture wounds on Clarence's arm and torso are circumstantial evidence that Lockhart possessed a pointed, thin-bladed weapon at the time of the battery. "Proof of the connection between the object and the defendant or the crime may be circumstantial." *Id.* A box cutter, the pointed razor blade of which could puncture skin, was found on Lockhart's person at the time of his arrest. Apparently, the box cutter was "suitable for the commission of the offense." *Id.* People's exhibit No. 4, therefore, was not clearly or obviously irrelevant. See *Clayton*, 2019 IL App (3d) 170315, ¶ 23; *Givens*, 135 Ill. App. 3d at 819. It follows that the procedural forfeiture of this evidentiary issue will be honored. See *People v. Albea*, 2017 IL App (2d) 150598, ¶ 17.

¶ 53 The forfeiture flows from the lack of a *clear or obvious* error in the admission of the box cutter in evidence. The lack of a clear or obvious error in turn defeats Lockhart's alternative claim that defense counsel rendered ineffective assistance by omitting an irrelevancy objection to the box cutter. "[B]ecause there was no clear or obvious error, there cannot be ineffective

assistance of counsel." *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 93. The box cutter was not clearly or obviously irrelevant. Therefore, refraining from objecting to it on the ground of irrelevancy fell within " 'the wide range of reasonable professional assistance.' " *People v. Jones*, 2020 IL App (4th) 190909, ¶ 177 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

¶ 54                              D. Grouping the Four *Zehr* Principles Together

¶ 55          Even though Lockhart never objected when the circuit court admonished the potential jurors and even though he never raised the issue in his posttrial motion (see *People v. Belknap*, 2014 IL 117094, ¶ 47), he now contends that, "by grouping the four distinct yet essential Rule 431(b) principles into one statement of law," the court "failed to implement the precise question-and-response framework required by" that rule. Again, because the evidence was closely balanced, Lockhart invokes the doctrine of plain error. See *Sebby*, 2017 IL 119445, ¶ 48.

¶ 56          Lockhart admits that in *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 57, the defendant made the same argument that Lockhart makes in the present appeal: that the circuit court "violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) by collapsing the four principles set forth in the rule into one broad instruction and failing to provide potential jurors with a 'meaningful opportunity *** to respond to each distinct concept.' " Lockhart also admits that, in *Kinnerson*, the Fourth District held that this method of questioning the potential jurors complied with Rule 431(b). *Kinnerson*, 2020 IL App (4th) 170650, ¶ 62. Adhering to *Kinnerson*, we find no plain error.

¶ 57                              E. The Claim of Cumulative Error

¶ 58          Lockhart complains that "the cumulative effect of the trial court's improper Rule 431 admonishments and the erroneous admission of evidence related to [the] box cutter combined

- 14 -

to deny [him] a fair trial." Finding no clear or obvious error in either respect, we reject the claim of cumulative error. See *People v. Doyle*, 328 Ill. App. 3d 1, 15 (2002).

¶ 59                           F. The One Act, One Crime Rule

¶ 60           According to Lockhart, his simultaneous convictions of aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2018)) and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)) violate the one act, one crime rule in that both convictions are based on a "single physical act." He admits that he did not raise the one act, one crime rule in the proceedings below. He points out, however, that any violation of the one act, one crime rule is a plain error, excusing a procedural forfeiture. See *People v. Harvey*, 211 Ill. 2d 368, 389 (2004).

¶ 61           The supreme court has prescribed the following analysis under the one act, one crime rule:

> "Whether a violation of the rule has occurred is a question of law, which we review *de novo*. [Citation.] In making that determination, this court has long followed a two-step analysis. [Citation.] First, the court ascertains whether the defendant's conduct consisted of a single physical act or separate acts. [Citation.] If it is determined that the defendant committed multiple acts, the court then moves to the second step and determines whether any of the offenses are lesser-included offenses. [Citation.] If none of the offenses are lesser-included offenses, then multiple convictions are proper. [Citation.] *People v. Coats*, 2018 IL 121926, ¶ 12.

¶ 62           Because Lockhart's conduct consisted of separate acts, we find, in our *de novo* review, no violation of the one act, one crime doctrine. See *id.* At some point during his fight with Clarence, Lockhart possessed the box cutter with the intent to cut Clarence with it. That physical act of mere possession, coupled with the requisite intent, consummated the offense of unlawful

- 15 -

possession of a weapon by a felon. See 720 ILCS 5/24-1.1(a), 24-1(a)(2) (West 2018). Lockhart subsequently used the box cutter to cut Clarence. That further physical act consummated the offense of aggravated battery. See 720 ILCS 5/12-3.05(f)(1) (West 2018). Thus, there were separate physical acts. As the State observes, "[a]s long as there are multiple acts ***, their interrelationship does not preclude multiple convictions." (Internal quotation marks omitted.) *People v. Rodriguez*, 169 Ill. 2d 183, 189 (1996).

¶ 63                                   III. CONCLUSION

¶ 64          For the foregoing reasons, we affirm the circuit court's judgment.

¶ 65          Affirmed.